UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KAYHAN BEHDIN, et al.,

        Plaintiffs,

    v.

JOSEPH B. EDLOW,

        Defendant.

Case No.  26-cv-00566-SVK

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 6

## I.    INTRODUCTION AND BACKGROUND

Plaintiffs, who are 31 citizens of Iran and 1 citizen of Sudan, seek a preliminary injunction directing the Government to complete adjudication of their pending applications for authorization to work in the United States.  Plaintiffs are lawfully in the United States and filed the pending applications for work authorization at various times between November 2024 and December 2025.  Since December 2025, their applications have been subject to a new policy of the United States Citizenship and Immigration Services ("USCIS") that indefinitely holds final adjudication of applications for immigration benefits filed by persons from certain countries including Iran and Sudan.  After carefully considering the facts and arguments set forth in the filings in this case, the arguments at the hearing, and the relevant law, the Court **GRANTS** Plaintiffs' motion for preliminary injunction on the terms and for the reasons discussed below.

### A.    USCIS hold on final adjudication of pending applications for immigration benefits by applicants from Iran, Sudan, and other countries

On December 2, 2025, USCIS issued Policy Memorandum PM-602-0192 ("PM-0192"), with the subject line:  "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries."  Dkt. 1-1.  PM-0192 places an "adjudicative hold" on a wide range of pending requests for immigration benefits filed by aliens from a list of 19 countries including Iran and Sudan.  *See id*. at 1, 2-3; *see also* Dkt. 23-1 at CAR000059, CAR000060.  "This hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum."  Dkt. 1-1 at 2-3.

USCIS issued a second Policy Memorandum on January 1, 2026 ("PM-0194"), with the

subject line "Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries," which stated that the guidance in PM-0192 remained in place and further explained that the "hold" on benefit applications "allows a case to proceed through processing, up to a final adjudication," *i.e.,* "the issuance of a final decision in a case, such as an approval, denial, or dismissal."   Dkt. 1-2 at 1, 2, and n. 2.

Both PM-0192 and PM-0194 (which this Order will refer to collectively as the "Policy Memoranda") refer to an Executive Order ("EO 14161") issued by President Trump on January 20, 2025, the first day of his second term, entitled "Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats."   Dkt. 1-1 at 2; Dkt. 1-2 at 2; *see also* Dkt. 23-1 (Certified Administrative Record) at CAR000001-CAR000003. As characterized by the Policy Memoranda, EO14161 "underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests."   Dkt. 1-1 at 2; Dkt. 1-2 at 2.

The Policy Memoranda also refer to Presidential Proclamation 10949 ("Proclamation 10949"), entitled "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats," which was issued by President Trump on June 4, 2025.  *Id.* at 1 n.1; Dkt. 1-2 at 1, n.1; *see also* Dkt. 23-1 at CAR000056-CAR000064.  The Policy Memoranda state that "[e]xercising authority under section 212(f) of the Immigration and Nationality Act ("INA"), the proclamation imposes restrictions, limitations, and exceptions on the entry of aliens from 19-high risk countries."   Dkt. 1-1 at 1 n.1; Dkt. 1-2 at 1 n.1.  Iran and Sudan are among the 19 countries listed in Proclamation 10949. Dkt. 23-1 at CAR000059, CAR000060.

On December 16, 2025, President Trump issued Presidential Proclamation 10998 ("Proclamation 10998"), entitled "Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States."   Dkt. 23-1 at CAR000065-CAR000077.  Proclamation 10998 expands the list of "Countries of Identified Concern" to 39 countries.  *Id.*  As explained in PM-0194, Proclamation 10998 imposes "further limitations … on the entry of aliens from additional high-risk countries."   Dkt. 1-2 at 3.

2

United States District Court
Northern District of California

**1.      Recent development:  USCIS 3/30 Alert**

On March 30, 2026, an alert was posted on USCIS's website entitled "Update on USCIS' Strengthened Screening and Vetting," available at https://www.uscis.gov/newsroom/alerts/update-on-uscis-strengthened-screening-and-vetting (last visited 4/7/2026) (the "USCIS 3/30 Alert"). The USCIS 3/30 Alert refers to PM-0192 and PM-0194[1] and states that they "placed on hold asylum applications [and] benefit requests from high-risk countries . . ."  The USCIS 3/30 Alert states that "USCIS has implemented a series of robust actions after issuance of those policy memoranda."  Among the "Enhanced Screening and Vetting Practices" identified in the USCIS 3/30 Alert are shortening validity periods for certain Employment Authorization Documents to require more frequent security checks.  The USCIS 3/30 Alert also states that USCIS implemented an "Internal Review Process":

> USCIS established an internal process for lifting holds on individual or group cases, requiring comprehensive review by multiple offices.  Holds have been lifted for aliens vetted through Operation PARRIS, certain petitions filed by U.S. citizens, intercountry adoption forms, certain rescheduled oath ceremonies, statutory and regulatory decision issuance, refugee registrations for South African citizens/nationals, certain special immigrant visa petitions, **certain employment authorization documents**, and asylum applications from non high-risk countries. We continue to review all application types and lift holds for both individual and group cases as appropriate. (emphasis added)

Because this case involves applications for employment authorization, on March 31, 2026, the Court ordered Defendant to provide a status report by April 7, 2026 stating whether the hold had been lifted as to any Plaintiff in this case and, if so, identifying such Plaintiff(s).  Dkt. 32. Defendant responded as follows:  "The adjudicative hold imposed under USCIS Policy Memorandums PM-602-0192 and PM-602-0194 has not been lifted as to any of the Plaintiffs in this case" under the USCIS 3/30 Alert.  Dkt. 35.

**2.      Recent development:  USCIS 3/31 Email**

On April 1, 2026, Plaintiffs filed a "notice of change in material facts" to advise the Court about an email sent by "USCIS Media" (USCISMedia@uscis.dhs.gov) to one or more recipients

---

[1] The USCIS 3/30 Alert also refers to an additional Policy Memorandum, PM-602-0193, which concerns applications for adjustment of status under the Diversity Immigrant Visa Program.

with the subject line "Re: Clarification on Iranian OPT Applications Under Presidential Proclamations." Dkt. 33; Dkt. 33-1 (the "USCIS 3/31 Email"). The email states: "We can provide the following for your reporting" and provides a "Statement Attributable to USCIS Spokesman Matthew J. Tragesser." Dkt. 33-1. The statement says that "Optional Practical Training (OPT) applications for Iranian nationals are banned and will not be processed, in accordance with Presidential Proclamation 10998 which restricts entry and visa issuance for nationals of certain countries." *Id.* The statement claims that the OPT program "has become a pathway for foreign students to secure long-term employment in the U.S., undermining qualified American workers and depressing wages." *Id.* The USCIS 3/31 Email also states "On Background" that "[a]lthough OPT is not a visa application and is tied to F-1 status, it is subject to the same country-specific restrictions and enforcement." *Id.* The USCIS 3/31 Email further states that "we will continue to pause decisions on immigration applications for aliens from high-risk countries, including Iran." *Id.* According to the notice filed by Plaintiffs along with the USCIS 3/31 Email, several Plaintiffs in this case have pending I-765 authorizations that are OPT applications. Dkt. 33.

On April 2, 2026, the Court invited Defendant to respond to Plaintiffs' notice of change in material facts. Dkt. 34. Defendant responded as follows: "Eleven of the Plaintiffs in this case have pending I-765 'OPT' applications. Their cases are currently still subject to the adjudicative hold imposed by USCIS Policy Memorandums PM-602-0192 and PM-602-0194." Dkt. 35.

### B.     The Plaintiffs

Plaintiffs are 31 citizens of Iran and one citizen of Sudan, and as such they are subject to the adjudication hold under the Policy Memoranda. *See* Dkt. 1 ¶¶ 18-49; Dkt. 1-1 at 1; Dkt. 1-2 at 1; Dkt. 23-1 at CAR000058. All Plaintiffs are presently in the United States and are either working in or enrolled in advanced degree programs in the fields of science, technology, or business. *See* Dkt. 6-2; Dkt. 28-1.

Each Plaintiff has a pending I-765 (*Application for Employment Authorization*) by which he or she seeks an Employment Authorization Document ("EAD"). Dkt. 1 ¶¶ 18-49; Dkt. 6-2; Dkt. 28-1. Plaintiffs filed their I-765 applications between October 2024 and December 2025. *Id.* More than half of Plaintiffs' I-765 applications were filed concurrent with Form I-485

(*Application to Register Permanent Residence of Adjust Status*) applications; a number of other Plaintiffs who filed I-765s are presently in F-1 nonimmigrant student status; and others filed derivative I-765 applications as spouses of applicants in other categories.  *See* Dkt. 6-2.

Eight of the Plaintiffs paid an additional "Premium Processing" fee of $1,685.00 under a USCIS program offering expedited processing of applications for immigration benefits. Dkt. 28-1; *see also* Dkt. 1 ¶¶ 57-58, 64.

All Plaintiffs have submitted declarations explaining the circumstances regarding their need for employment authorization.  Dkt. 6-2.

### C.      Procedural background

On January 19, 2026, Plaintiffs filed this action to compel USCIS to adjudicate their I-765 applications.  Dkt. 1.  The Defendant is Joseph B. Edlow, Director of USCIS.  *Id.* ¶ 50.  All Parties have consented to the jurisdiction of a magistrate judge.  Dkt. 12, 15.

On January 21, 2026, Plaintiffs filed the motion for preliminary injunction now before the Court, in which they seek to compel Defendant to adjudicate their Form I-765 applications within 30 days of issuance of the Court's order.  The motion is fully briefed.  Dkt. 6 (motion), Dkt. 22 (opposition), Dkt. 24 (reply). The Court held an in-person hearing on March 3, 2026.  *See* Dkt. 27. After hearing extensive argument, the Court ordered Plaintiffs to submit a chart containing certain information about each Plaintiff and their I-765 application, which they have done.  Dkt. 26, 28.

The Court granted a stipulation between the Parties that acknowledged that in another case before this Court,[2] Defendant had already produced the Administrative Record for PM-0192 to the same Plaintiffs' counsel and agreed that Defendant would provide the Administrative Record for PM-0194 in this case.  Dkt. 20.  Defendant thereafter filed the Certified Administrative Record. Dkt. 23; Dkt. 23-1 (Certified Administrative Record or "CAR").

## II.     LEGAL STANDARD

### A.      MOTION FOR PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Its purpose is to maintain the "status

---

[2] *Varniab v. Edlow*, Case No. 25-cv-10602-SVK

quo ante litem"—that is, "the last uncontested status which preceded the pending controversy"—pending a decision on the merits. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (finding "status quo ante litem" in trademark infringement suit "existed before [the defendant] began using its allegedly infringing logo") (internal quotation marks and citation omitted).

To obtain a preliminary injunction, Plaintiffs must establish that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. A showing on all four *Winter* factors is required. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). However, the Ninth Circuit takes a "sliding scale" approach, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131; *see also Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 843–44 (9th Cir. 2024). Specifically, "a preliminary injunction may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Planned Parenthood,* 122 F.4th at 844 (quoting *Cottrell*, 632 F.3d at 1135).

**B.    RELEVANT FRAMEWORK FOR EMPLOYMENT AUTHORIZATION UNDER THE IMMIGRATION LAWS**

As noted above, Plaintiffs submitted their I-765 applications under a variety of circumstances: some concurrent with Form I-485 (*Application to Register Permanent Residence of Adjust Status*) applications; some to obtain employment following completion of their degrees in the United States; and others as derivative applicants based on their spouses' primary applications. *See* Dkt. 6-2. The Parties provide minimal discussion of the relevant legal framework for employment authorization under the immigration laws and do not identify any reasons why the different circumstances under which the Plaintiffs submitted their I-765s impact the analysis of issues relevant to the present motion for preliminary injunction. Nevertheless, the Court provides a high-level overview of the relevant immigration law framework.

*Applicants for adjustment of status:*  Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, certain immigrants can apply to adjust their status to lawful permanent resident using Form I-485 (*Application to Register Permanent Residence or Adjust Status*), based on a pending or approved immigrant petition and if certain threshold requirements are met. 8 U.S.C. § 1255(a); *see also* 8 C.F.R. § 245.2(a)(2)(i)(B) (providing for the concurrent filing of an adjustment of status application with certain employment-based immigrant petitions).

USCIS engages in a multi-step process when evaluating an application for adjustment of status.  Section 1255(a) provides:

> The status of an alien who was inspected and admitted . . . into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a); *see also* 8 C.F.R. § 245.1(a).

An applicant for adjustment of status may also apply for employment authorization. 8 C.F.R. § 274a.12(c)(9).

*F-1 visaholders:*  F-1 visas are non-immigrant visas for individuals who are students here but do not intend to abandon their residence outside of the United States.  *See* 8 U.S.C. § 1101(a)(15)(F).  F-1 students are subject to a number of limitations on their employment.  *See* 8 C.F.R. § 274a.12(b)(6); *and see generally Wash. Alliance of Tech. Workers v. United States Dep't of Homeland Sec.*, 50 F.4th 164 (D.D.C. 2022).   F-1 students must submit a Form I-765 under certain circumstances, such as to obtain employment directly related to their field of study for a limited period after they complete a degree in the United States.  *See* 8 C.F.R. § 214.2(f)(11)(i)(A).

*Spouses:*  Spouses of certain applicants can also file for employment authorization.  For example, the spouse of an "alien of exceptional ability" who holds a EB-1A visa can also file a Form I-485 application as a derivative applicant of the primary EB-1A applicant. *See* 8 U.S.C.

United States District Court
Northern District of California

§ 1153(d) ("A spouse . . . shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a), (b), or (c), be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse[.]").

## III.   DISCUSSION

### A.   Subject Matter Jurisdiction

Defendant argues that 8 U.S.C. § 1252(a)(2)(B) strips the Court of subject matter jurisdiction over this case. Dkt. 22 at 7-9. 8 U.S.C. § 1252 is entitled "Judicial review of orders of removal" and provides, in relevant part:

> **(a) Applicable provisions**
>
> **(1) General orders of removal**
> Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 1225(b)(1) of this title) is governed only by chapter 158 of Title 28, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.
>
> **(2) Matters not subject to judicial review**
> …
> **(B) Denials of discretionary relief**
> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> (i)    any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii)    any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

28 U.S.C. § 1252.

The Parties disagree about whether section 1252 applies in this case, where it is undisputed

United States District Court
Northern District of California

that there is no final order or judgment on Plaintiffs' I-765 applications. *See* Dkt. 22 at 2 (statement by Defendant that "none of Plaintiffs has received a final agency decision on any of their I-765's"); Dkt. 24 at 2 (argument by Plaintiffs that section 1252 is "a statute governing relief from removal that is wholly inapplicable to the context of Plaintiffs' status as I-765 applicants that have not received final decisions").

Although Defendant's jurisdictional argument focuses primarily on subsection 1252(a)(2)(B)(ii) (*see* Dkt. 22 at 7-9), Defendant also argues that "Plaintiffs' claims are barred by § 1252(a)(2)(B)(i) and (ii)" (*id.* at 9). Accordingly, the Court turns to the Parties' specific arguments as to whether subsections 1252(a)(2)(B)(i) or (B)(ii) strip the Court of jurisdiction.

### 1.     8 U.S.C. § 1252(a)(2)(B)(i)

Section 1252(a)(2)(B)(i) enumerates several statutory provisions that provide for discretionary relief. Here, Defendant cites 8 U.S.C. § 1324a as the source of authority for the Attorney General (now the DHS Secretary) to authorize employment for aliens in various categories. Dkt. 22 at 7. Section 1324a is not among the statutes listed in subsection (B)(i).

Nevertheless, Defendant cites cases including *Patel v. USCIS*, 596 U.S. 328 (2022) and *Zia v. Garland*, 112 F.4th 1194 (9th Cir. 2024) for the proposition that subsection (B)(i) bars review not only of last-in-time judgments but also of "[a]ny factual findings or decisions that are made during the processing of Plaintiffs' I-765 decisions." Dkt. 22 at 8-9. Defendant is correct that section 1252(a)(2)(B)(i)'s bar on judicial review applies more broadly than a final judgment or decision on an immigration-related application. *See Garcia v. USCIS*, 146 F.4th 743, 748 (9th Cir. 2025) (stating that "broad" language of subsection (B)(i) covers "any judgment of whatever kind, and, through the term 'regarding,' not just the granting of relief[,] but also any judgment *relating to* the granting of relief" (quoting *Patel*, 596 U.S. at 338-39) (emphasis in original, internal quotation marks omitted)) ), *cert. denied,* 2026 WL 858448 (Mar. 30, 2026).[3]

---

[3] Plaintiffs' reply brief contains a statement that section 1252 "only applies in the context of removal proceedings." Dkt. 24 at 3. However, the Ninth Circuit has held that "§ 1252(a)(2)(B)(i) precludes district court review of challenges to USCIS adjustment of status determinations made outside the context of removal proceedings." *Garcia*, 146 F.4th at 749; *see also Nakka v. USCIS*, 111 F.4th 995, 1014 (9th Cir. 2024) ("Although it is a close question … we conclude that 'relief under section … 1255' refers generally to adjustment of status, whether the applicant is seeking relief from removal or not").

However, the cases upon which Defendant relies each involved the question of whether courts have jurisdiction to review factual findings and other preliminary decisions made in connection with final decisions on individual applications for immigration benefits.  *See Patel*, 596 U.S. at 338 (holding that subsection (B)(i) prohibited judicial review of factual findings that were the basis of the immigration judge's denial of application for adjustment of status and issuance of removal order); *Zia*, 112 F.4th at 1201 (holding that court did not have jurisdiction to review decision on a good faith marriage waiver and any underlying determination of plaintiff's eligibility which resulted denial of petition to remove conditional bass of permanent resident status); *see also Garcia*, 146 F.4th at 747, 751 (holding that court did not have jurisdiction to review challenge to USCIS's authority to require medical examinations for certain applicants for adjustment of status where plaintiff's application had been denied).  Those cases are distinguishable from this one, where Plaintiffs do not seek review of any "factual findings or decisions" made in connection with a decision on their applications.  They instead seek review of Defendant's *failure to decide* their applications pursuant to the adjudication hold implemented under the Policy Memoranda.

The Ninth Circuit recently concluded that "§ 1252(a)(2)(B)(i) does not categorically strip federal district courts of jurisdiction" to hear claims that "challenge generally applicable agency policies without referring to or relying on denials of individual applications for relief."  *Nakka v. USCIS*, 111 F.4th 995, 999 (9th Cir. 2024); *see also id*. at 1009.  As the Ninth Circuit explained in its subsequent decision in *Garcia*, "*Nakka* [] concluded that Congress has clearly indicated that it did not intend § 1252(a)(2)(B)(i) to preclude district court jurisdiction over collateral policy and procedure claims when not made in connection with a challenge to the denial of individual discretionary relief."  *Garcia*, 146 F.4th at 749 (internal quotation marks and citations omitted).  The Ninth Circuit held in both *Nakka* and *Garcia* that it could not hear such "collateral" claims by the particular plaintiffs in those cases.  In *Nakka*, a putative class action challenging a USCIS policy relating to visa retrogression, "only one of the named Plaintiffs filed an application for adjustment of status."  *Nakka,* 111 F.4th at 1010.  The Ninth Circuit held that the "non-filing" plaintiffs did not have ripe claims.  *Id*. at 1010-11.  Although the one "filing" plaintiff had a ripe claim, the court lacked jurisdiction for a different reason:  her application for adjustment of status

10

had been denied, so under 8 U.S.C. § 1252(a)(2)(D) her challenge was "channeled" into a different, more limited review process. *Id.* at 1012, 1014-15. The plaintiff in *Garcia* fell into the same category as the one "filing" plaintiff in *Nakka* because USCIS had denied her application for adjustment of status. *Garcia,* 146 F.3d at 751. Here, however, Plaintiffs fall into a third category not at issue in *Nakka* or *Garcia*: they have filed applications for employment authorization but USCIS has not decided the applications because of the adjudication hold policy. Under these circumstances, subsection (B)(i) does not strip the Court of jurisdiction.

The Court concludes that to the extent section (B)(i) is applicable, it does not strip it of jurisdiction in this case. Plaintiffs do not seek review of any final decision, or any subsidiary or preliminary decisions or factual findings, on their I-765 applications for immigration benefits. They instead seek review of Defendants' failure to issue a decision on their applications because of the adjudication hold policy set forth in the Policy Memoranda.

### 2. 8 U.S.C. § 1252(a)(2)(B)(ii)

Defendant also argues that under section 1252(a)(2)(B)(ii), the Court lacks jurisdiction because Plaintiffs seek review of discretionary decisions or actions. Dkt. 22 at 7-9. Defendant states "Section 1324a falls within the same subchapter as section 1252(a)(2)(B)(ii) and is thus subject to" the jurisdictional bar under subsection (B)(ii). *Id.* at 7.

The crux of Defendant's argument under subsection (B)(ii) is that USCIS's discretion over whether to ultimately grant or deny employment authorization also gives it discretion over the procedures and timing by which such a decision is made. *See, e.g., id.* at 9 (arguing that USCIS's decision to hold adjudication of immigration benefit applications for "further security screening" is "the kind of discretionary decision that Congress has shielded from judicial review under 8 U.S.C. § 1252(a)(2)(B)(ii)"). Defendant specifically cites three sources of discretion as being relevant here: (1) 8 U.S.C. § 1324a(h)(3); (2) 8 C.F.R. § 274a.13(a)(1); and (3) the absence of a statutory timeline for the adjustment of status. *Id.* at 7-9. Defendant also cites various cases in support of its jurisdiction-stripping argument.

Notably, however, when asked at the preliminary injunction hearing whether the Government's position is that it has "the discretion not to decide" an application for an EAD, counsel for Defendant answered: "No. I think that is not correct. [] I think that they do have a

United States District Court
Northern District of California

duty to act on it within a reasonable time." Dkt. 39 (3/3/26 Hrg. Tr.) at 17:12-23. This concession is inconsistent with any suggestion that Defendant has discretion to indefinitely withhold adjudication of Plaintiffs' applications for employment authorization. Defendant insists that ultimately "there will be an adjudication," but he concedes that the hold is indefinite. *Id.* at 18:11-15, 19:1-2, 19:8-14. Defendant was unable to offer any factual support that there will be an end to the hold. *Id.* at 20:14-22:5.

To the extent any argument remains over whether subsection (B)(ii) strips the Court of jurisdiction, the authorities cited by Defendant do not support that argument.

### a.    8 U.S.C. § 1324a(h)(3)

Defendant argues that decisions regarding employment authorization are discretionary under 8 U.S.C. § 1324a(h)(3). Dkt. 22 at 7-8. That section states that "the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time … (B) authorized to be so employed by this chapter or the Attorney General." 8 U.S.C. § 1324a(h)(3). This section has been read as "express recognition that aliens may be 'authorized to be … employed … by' DHS . . ." *Save Jobs USA v. U.S. Dep't of Homeland Security,* 664 F. Supp. 3d 143, 149 (D.D.C. 2023) (quoting *Washington Alliance of Tech. Workers v. United States Dep't of Homeland Security*, 50 F.4th 164, 191 (D.C. Cir. 2022)), *aff'd*, 111 F. 4th 76 (D.C. Cir. 2024), *cert. denied*, 146 S. Ct. 319 (2025).

Defendant attempts to leverage whatever discretion this statute gives USCIS over the ultimate decision of whether to grant employment authorization into broad discretion to decide the procedures and timing by which applications for employment authorization are adjudicated. *See* Dkt. 22 at 7 ("The First Circuit recognized that when a statute grants discretionary authority over a benefit's substance, challenges to procedures and timing fall within § 1252(a)(2)(B)(ii)" (citing *Gupta v. Jaddou*, 118 F.4th 475, 482-87 (1st Cir. 2024)); *id.* at 9 ("USCIS has discretion to determine the exact nature of the required processing"); *id.* (the absence of a statutory timeline for USCIS to adjudicate employment authorization applications "confirms that Congress intended to leave the timing of such adjudications to the agency's discretion").

The problem with Defendant's argument is that he concedes that USCIS has a duty to act on applications for employment authorization within a reasonable time (Dkt. 39 (3/3/26 Hrg. Tr.)

12

at 17:22-23), but the Policy Memoranda impose an indefinite hold on the adjudication of such applications.   Defendant's argument also runs headlong into many cases holding that a variety of provisions of the INA do not provide discretionary authority over the pace of adjudicating applications.  In *Wang v. Chertoff*, for example, another district court in the Ninth Circuit rejected the Government's argument that USCIS's failure to act on Form I-485 applications within a reasonable time was shielded from judicial review, noting that "dozens (if not hundreds) of district courts" had considered the issue of whether courts have jurisdiction over challenge to pace of adjudicating immigration applications, with "the clear majority of district courts within the Ninth Circuit" and "the majority of district courts nationwide" having concluded that §1252(a)(2)(B)(ii) does not bar judicial review.  550 F. Supp. 2d 1253, 1256-57 (W.D. Wash. 2008) (citing cases). *Wang* concluded that "courts in the Northern District of California have been unanimous in reaching the same conclusion."  *Id.* at 1257 (citing cases); *see also Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1163 (N.D. Cal. 2007) (noting split in authority regarding whether "section 1252 read in conjunction with section 1255" precluded judicial review over pace-of-processing claims but concluding that jurisdiction exists, noting that "[t]his issue has come before the Northern District of California at least nine previous times in recent months (ten if an analogous examination of an I–130 application is counted), and in each instance, the position advanced by the government has been rejected and an obligation to process such applications in a reasonable period of time has been found").

"[T]he majority of district courts" in the Ninth Circuit have declined to follow cases that have concluded that the pace of adjudication is discretionary and thus not subject to judicial review, instead holding that "the government has a non-discretionary duty to adjudicate [petitions for adjustment of status] within a reasonable period of time" and that courts have jurisdiction to review the Government's failure to do so.   *Khan v. Johnson*, 65 F. Supp. 3d 918, 924-25 and n. 4 (C.D. Cal. 2014) and cases cited therein; *see also Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1069 (N.D. Cal. 2014)  ("Indeed, the government has a non-discretionary duty to adjudicate [petition for adjustment of status] within a reasonable period of time" and "[t]o hold otherwise would be to sanction the perpetual delay of governmental obligations that are clearly mandated by law" (internal quotation marks and citations omitted)); *Mugomoke v. Curda*, No. 2:10-CV-02166 KJM

13

DAD, 2012 WL 113800, at *4 (E.D. Cal. Jan. 13, 2012) ("While the Secretary has discretion to decide the outcome of an I–485 application, the authority to not act on an application is not conferred by any statute. Thus a failure to act on an I–485 application falls within the APA's default rule: 'With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it.' (citing 5 U.S.C. § 555(b)).

### b.    8 C.F.R. § 274a.13(a)(1)

Defendant argues that "[t]he governing regulation, consistent with the Secretary's statutory discretionary authority to provide employment authorization, expressly provides that USCIS has discretion to make employment authorization decisions in I-765's:  'The approval of applications filed under 8 CFR 274a.12(c), except for 8 CFR § 274a.12(c)(8), *are within the discretion of USCIS.*'"  Dkt. 22 at 7-8 (quoting 8 C.F.R. § 274a.13(a)(1)) (emphasis in Defendant's brief). Defendant suggests that "USCIS has discretion to determine the exact nature of the required processing" and thus "USCIS, in its discretion, is conducting additional security checks on certain individuals applying for employment authorization, including the Plaintiffs."  Dkt. 22 at 9 (citing Policy Memoranda at 1-3).

Defendant's argument that 8 C.F.R. § 274a.13(a)(1) gives USCIS discretion to place an indefinite hold on final adjudication of Plaintiffs' applications for employment authorizations fails for several reasons.  First, the cited language of this regulation gives USCIS discretion over the "approval" of certain applications for employment authorizations.  8 C.F.R. § 274a.13(a)(1).  In other words, as Defendant acknowledges, that regulation gives USCIS "the authority to grant or deny employment authorization under most categories, including the categories applicable to Plaintiffs' Form I-765 applications."  Dkt. 22 at 8.  USCIS's discretion as to whether to "grant or deny" an application for employment authorization does not give USCIS discretion to *withhold* a decision on such applications.

Second, 8 C.F.R. § 274a.13(a)(1) must be read in conjunction with other relevant statutes and regulations.  For example, 5 U.S.C. § 555(b) requires that an agency shall conclude a matter presented to it "within a reasonable time."  Here, the regulations provide that an alien requesting

14

employment authorization and/or an EAD may apply on a form designated by USCIS and "shall be notified" of the approval or denial of the application." 8 C.F.R. § 274a.13(a), (b), (c). The regulation does not authorize the agency to hold applications indefinitely, neither approving or denying them.

Moreover, a number of the I-765 applications filed by Plaintiffs were filed in connection with Form I-485 (*Application for Adjustment of Status*) applications. *See* Dkt. 6-2; 28-1. 8 C.F.R. § 245.2(a)(5)(i) states that an I–485 applicant "shall be notified of the decision of the director and, if the application is denied, the reasons for the denial." "Under either the default rule of § 555(b) or a non-discretionary duty imposed by 8 C.F.R. § 245.2(a)(5)(i) and 8 C.F.R. § 103.2(b)(18), the USCIS has a duty to decide I–485 applications." *Mugomoke*, 2012 WL 113800, at *5; *see also Gianni v. Curda,* No. 2:07–cv–1478 GEB KJM, 2008 WL 479991, at *2 (E.D. Cal. Feb.19, 2008). "Section 1252(a)(2)(B)(ii) does not withdraw the Court's jurisdiction to compel Defendants to make a decision if that decision is unlawfully withheld." *Mugomoke*, 2012 WL 113800, at *5 (citing 5 U.S.C. § 706(1)).

Third, because 8 C.F.R. § 274a.13(a)(1) is a regulation, not a statute, it does not insulate USCIS's hold policy from judicial review under 8 U.S.C. § 1252(a)(2)(B)(ii). By its terms, subsection (B)(ii) concerns only statutory (not regulatory) bases for discretion. "[B]oth clauses [of § 1252(a)(2)(B)] convey that Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute." *Kucana v. Holder,* 558 U.S. 233, 247 (2010); *Mugomoke*, 2012 WL 113800, at *4 ("the authority to not act on an application is not conferred by any statute"); *Wang*, 550 F. Supp. 2d at 1258 (regulation at issue "has no relevance in the court's discussion of the applicability of § 1252(a)(2)(B)(ii), which concerns only *statutory* bases for discretion" (citing *Spencer Enters. Inc. v. United States,* 345 F.3d 683, 691 (9th Cir. 2003) (emphasis in original)). As the Supreme Court recognized in *Kucana*, reading section 1252(a)(2)(B)(ii) to bar judicial review of administrative decisions made discretionary by regulation "would free the Executive to shelter its own decisions … simply by issuing a regulation declaring those decisions 'discretionary.'" 558 U.S. at 830.

////

15

### c.    Absence of statutory timeline

Defendant argues that "[w]here Congress intends to require timely adjudication, it says so explicitly," whereas here "Congress has not imposed any statutory timeline for USCIS to adjudicate employment authorization applications." Dkt. 22 at 9. Defendant argues that the absence of an explicit timeline for adjustment of status "confirms that Congress intended to leave the timing of such adjudications to the agency's discretion." *Id.* The Court rejects this argument for the reasons discussed in section III.B.1.a. of this order and finds that Defendant has a non-discretionary duty to decide Plaintiffs' applications within a reasonable time.

### d.    Case law

Some of the cases Defendant cites in support of its argument that its decision to place an adjudication hold on immigration benefit applications is unreviewable under section 1252(a)(2)(B)(ii) involved the "retrogression hold" policies of the State Department and USCIS to hold in abeyance applications for adjustment of status until one of a limited number of annual visas became available. *See Gupta v. Jaddou*, 118 F.4th 475, 482-87 (1st Cir. 2024); *Kale v. Alfonso-Royals*, 139 F.4th 329, 336 (4th Cir. 2025). Visa retrogression stands on a different factual and legal footing than the adjudication hold implemented under the Policy Memoranda. Under the retrogression hold policies, USCIS placed adjustment applications on hold until a condition precedent was satisfied—availability of a visa number—and in some cases those holds lasted for years. *See Gupta*, 118 F.4th at 481.

Here, by contrast, Defendants have not identified the "condition precedent" for the adjudication hold under the Policy Memoranda to be lifted, and as discussed further in section III.B.1.a. below, no end point is apparent from the Policy Memoranda themselves. In *Varniab v. Edlow,* another case before this Court challenging the adjudication hold under PM-0192, Government counsel stated at the preliminary injunction hearing that "applications that are subject to this hold would still go through all of those processes, until they are ready for the final decision, and then that's where they would be held, and then we're looking for further guidance as to kind of what to do at that point." *Varniab v. Edlow*, No. 25-cv-10602-SVK, 2026 WL 485490, at *7 (N.D. Cal. Feb. 20, 2026). Since this Court issued a preliminary injunction in *Varniab*, USCIS issued the USCIS 3/30 Alert, which states that the agency has developed "an internal process for

16

lifting holds on individual or group cases," has lifted the hold on "certain employment authorization documents," and "continue[s] to review all application types and lift holds for both individual and group cases as appropriate."  It is not clear whether the USCIS 3/30 Alert, which is in the nature of a press release, is the "further guidance" contemplated by the Policy Memoranda, and it is notable that Defendant has not provided the Court with any evidence of formal, internal guidance regarding changes to the adjudication hold implemented under the Policy Memoranda.  In any event, Defendant has confirmed that the adjudicatory hold remains in place as to the Plaintiffs in this case.  Dkt. 35.  Thus, the limited evidence before the Court of recent developments does not warrant a different conclusion than the Court reached in *Varniab*:  the hold on final adjudication of immigration benefits applications from the countries subject to the Policy Memoranda is indefinite in duration and is thus distinguishable from visa retrogression policies.

Moreover, the retrogression hold policies have different statutory and regulatory underpinnings than USCIS's recent policy of holding final adjudication of certain applications pursuant to the Policy Memoranda.  Of note, the retrogression hold policies find support in 8 C.F.R. § 245.2(a)(5)(ii), which provides that certain applications for adjustment of status "shall not be approved until an immigrant visa number has been allocated by the Department of State." *See Babaria v. Blinken*, 87 F.4th 963, 972 (9th Cir. 2023).  Defendant has not identified any analogous statute or regulation that specifically authorizes the adjudication hold under the Policy Memoranda.

Thus, Defendants cannot successfully extrapolate from the visa retrogression cases a general principle that section 1252(a)(2)(B)(ii) bars judicial review of USCIS's decision to impose an adjudication hold.  Indeed, in *Gupta,* one of the cases cited by Defendant in support of this argument (*see* Dkt. 2 at 7), the court expressly declined to hold that section 1252(a)(2)(B)(ii) barred review and instead "assume[d] there are no statutory bars to the exercise of jurisdiction" because it resolved the merits of the case in the Government's favor.  118 F.4th at 182.

The non-retrogression cases cited by Defendants for the proposition that they have unreviewable discretion to hold adjudication on adjustment of status applications are also distinguishable.  For example, *Orlov v. Howard*, 523 F. Supp. 2d 30 (D.D.C. 2007), "concerned applications for adjustment of status that were under active (though deliberate) consideration at the

17

time of the suit" and stood in contrast to a case in which an application for adjustment of status had been "formally placed on hold."  *Geneme v. Holder*, 935 F. Supp. 2d 184, 190 (D.D.C. 2013) (holding that section 1252 "does not specify that USCIS shall have discretion to decide whether and when to adjudicate applications for adjustment of status"); *see also Mohsenzadeh v. Kelly*, 276 F. Supp. 3d 1007, 1014 (C.D. Cal. 2017) (distinguishing cases involving "refusal to adjudicate" from those involving "slow-paced processing," stating that "[r]efusal to process applications arguably falls outside the scope of § 1252(a)(2)(B)(ii)").  Here, unlike in *Orlov*, Plaintiffs' applications are not merely being processed slowly; final adjudication is on hold.  An additional, overarching problem with Defendant's jurisdiction-stripping argument is that numerous courts have recently concluded that subsection (B)(ii) only precludes judicial review of decisions denying discretionary relief on individual applications and does not preclude judicial review of the Government's decision to categorically act or withhold action.  *See, e.g., Bowser v. Noem,* No. 26-CV-10382-AK, 2026 WL 555624, at *4 (D. Mass. Feb. 27, 2026) (holding that "Section 1252(a)(2)(B)(ii) does not strip this Court of jurisdiction" to review claims seeking review of the failure to adjudicate applications for immigration benefits as a result of the adjudication hold imposed by the same Policy Memoranda at issue in this case); *Miot v. Trump,* -- F. Supp. 3d --, 2026 WL 266413, at * 17 (D.D.C. Feb. 2, 2026), *cert. granted sub nom. Trump v. Miot*, No. 25-1084, 25A999, -- S. Ct. --, 2026 WL 731087 (Mem) (Mar. 16, 2026) (holding that "Subsection (a)(2)(B)(ii) poses no barrier to the Court's review" of decision of DHS Secretary to terminate Temporary Protected Status designation for Haiti); *Doe v. Noem*, 778 F. Supp. 3d 311, 332 (D. Mass. 2025), *vacated and remanded on other grounds*, 152 F.4th 272 (1st Cir. 2025) (holding that "categorical actions challenged here," which were decisions to terminate parole program for aliens from certain countries, were not precluded from judicial review by subsection (B)(ii)).

In arguing that subsection (B)(ii) strips this Court of jurisdiction, Defendant emphasizes another out-of-district case that involved routine processing delays, *Khachutorov v. Britten*, 792 F. Supp. 3d 1106 (C.D. Cal. 2025).  Dkt. 22 at 9.  The court in *Khachutorov* noted a disagreement among district courts in the Ninth Circuit about "whether the government has a nondiscretionary duty to adjudicate applications for adjustment of status within a reasonable period of time" and

sided with cases finding that "government decisions regarding the pace of review of an application are generally discretionary and therefore insulated from judicial review." *Khachutorov,* 792 F. Supp. 3d at 1113-14 (citing cases).  In so holding, however, the court noted that "[i]n particular, this case 'does not present the extreme delay necessary to show that Defendants are refusing to act' on Plaintiffs' applications." *Id.* at 1114 (quoting *Mohsenzadeh,* 276 F. Supp. 3d at 1014).  In *Mohsenzadeh,* the court distinguished cases involving "refusal to adjudicate" from those involving "slow-paced processing," stating that "[r]efusal to process applications arguably falls outside the scope of § 1252(a)(2)(B)(ii)."  The court in *Khachutorov* expressly stated that it did *not* conclude that an APA claim in the context of a refusal to act would be barred from judicial review.  792 F. Supp. 3d at 1114 n.3.  This case stands on a different footing than *Khachutorov* on this "particular" issue:  USCIS has placed an indefinite adjudication hold on Plaintiffs' applications for work authorization.

In any event, as discussed in section III.A.2.a. above, "the majority of district courts" in the Ninth Circuit have declined to follow cases that have concluded that the pace of adjudication is discretionary and thus not subject to judicial review.  Moreover, in *Bowser*, a court in another district concluded it had jurisdiction over claims concerning USCIS's failure to adjudicate applications for immigration benefits as a result of the adjudication hold imposed by the same Policy Memoranda at issue in this case.  2026 WL 555624, at *4.

Although Defendant suggests that the jurisdiction-stripping provision under 1252(a)(2)(B)(ii) might have even broader effect where an agency's decision is motivated by "national security" considerations (Dkt. 22 at 9), the authorities cited by Defendant do not support its argument.  In *Trump v. Hawaii*, the Supreme Court assumed that the claims in that case (which involved "a national security directive regulating the entry of aliens abroad") were subject to judicial review.  585 U.S. 667, 682-83, 702 (2018).  Another case cited by Defendant, *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988), did not discuss section 1252 and was not an immigration case.  As discussed below, Defendant has failed to establish any particularized national security interest that would shield from judicial review the adjudication hold under the Policy Memoranda, which is preventing timely adjudication of applications for employment authorization from Plaintiffs who are already in the United States.

19

United States District Court
Northern District of California

### 3. Conclusion on subject matter jurisdiction

For the reasons discussed, the Court concludes that it has subject matter jurisdiction. This conclusion is consistent with the "well-settled" and "strong" presumption in favor of judicial review of administrative action, *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020), which courts "consistently" apply to "legislation regarding immigration," *Kucana*, 558 U.S. at 251.

### B. Preliminary Injunction

The Court next addresses whether Plaintiffs have demonstrated that the four factors for issuance of a preliminary injunction are satisfied. *See Winter*, 555 U.S. at 20.

### 1. Likelihood of success

Plaintiffs frame their challenge to the adjudication hold under the Policy Memoranda in various ways, arguing that the hold policy violates Defendant's duty to adjudicate immigration benefit applications, is arbitrary and capricious, did not comply with the procedural requirements of the APA, unlawfully discriminates against applicants on the basis of national origin, and is in excess of Defendant's authority. *See generally* Dkt. 1; *see also* Dkt. 6-1. Whichever way the argument is framed, Plaintiffs' essential argument is the same: USCIS's indefinite hold on final adjudication of I-765 applications by aliens from certain countries under the Policy Memoranda is not lawful. Plaintiffs are likely to succeed on one or more of their claims.

### a. Claim 1 (writ of mandamus) and Claim 2 (APA duty to act)

Plaintiffs' first cause of action invokes the Court's mandamus power under 28 U.S.C. § 1361 "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Plaintiffs' second cause of action is brought under the APA, under which a court may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Both of these statutory schemes provide avenues for relief that are "essentially the same," and thus the Court need not engage in a separate evaluation of Plaintiffs' likely success on the first and second causes of action. *See Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (declining to engage in separate analysis of claims under 28 U.S.C. § 1361 and APA); *Wang*, 550 F. Supp. 2d at 1257-58 (same). Therefore the Court focuses on Plaintiffs' claim seeking relief under the APA for Defendant's alleged withholding and/or delay in connection with their I-765 applications. *See Independence Min. Co.*, 105 F.3d at 507.

20

### i.      Mandatory duty to act

Under section 706(1) of the APA, a plaintiff must identify a "*discrete* agency action" that the agency is legally "*required* to take." *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 64 (2004) (emphasis in original).  As noted above, Defendant conceded at the preliminary injunction hearing that it has a duty to act on Plaintiff's applications for employment authorization within a reasonable time and that the hold on adjudication is indefinite.  Dkt. 39 (3/3/26 Hrg. Tr.) at 17:22-23, 18:11-15, 19:1-2, 19:8-14, 20:14-22:5.

Despite this concession, Defendant argues in the opposition brief that Plaintiffs "have not identified an unequivocal mandate with which USCIS has failed to comply."  Dkt. 22 at 12. Specifically, Defendant argues that "USCIS has authority to approve I-765 applications in its 'discretion'" and "this is not a 'specific, unequivocal command' for USCIS to take a 'discrete agency action' on Plaintiffs' pending I-765's."  *Id.* (citing 8 C.F.R. § 274a.13(a)(1) and *Khachutorov v. Britten,* 792 F. Supp. 3d 1106, 1113 (C.D. Cal. 2025)).  However, as explained in section III.A. above, Defendant's discretion as to whether to grant or deny particular I-765 applications does not give Defendant unfettered discretion to indefinitely and categorically delay or withhold adjudication of such applications, and neither 8 C.F.R. §274a.13(a)(1) nor *Khachutorov* dictate otherwise.  "[T]here is a difference between the [agency's] discretion over *how* to resolve an application and the [agency's] discretion over *whether* it resolves an application."   *See Singh*, 470 F. Supp. 2d at 1067 (emphasis in original)).

As discussed in greater detail in section II.B. above, aliens in various situations are allowed to apply for employment authorization.  The regulations provide that an alien requesting employment authorization and/or an EAD may apply on a form designated by USCIS and "shall be notified" of the approval or denial of the application."  8 C.F.R. § 274a.13(a), (b), (c).  The regulation does not authorize the agency to hold applications indefinitely, neither approving nor denying them.[4]

---

[4] As this Court discussed in *Varniab*, some Form I-765 applications may be filed "ancillary" to other applications, such as Form I-485 applications.  2026 WL 485490, at *2.  Statutes and regulations regarding those other applications may establish additional mandatory duties to act. For example, similar to 8 C.F.R. § 274a.13(a), (b), (c) concerning applications for employment authorization the regulations concerning adjustment of status require that the applicant "be notified

United States District Court
Northern District of California

The other cases Defendant cites in support of his argument that Plaintiffs are unlikely to succeed on their APA claim (*see* Dkt. 22 at 12), all of which are from outside the Ninth Circuit, are also distinguishable. *Cheejati v. Blinken*, 106 F.4th 388 (5th Cir. 2024) and *Kanapuram v. USCIS*, 131 F.4th 1306 (11th Cir. 2025) are both visa retrogression cases, which are distinguishable for reasons discussed in section III.A.2.d. above. *Goumilevski v. Chertoff*, No. DKC 2006-3247, 2007 WL 5986612, at *5 (D. Md. July 7, 2017), like *Khachutorov*, involves routine processing delays, not a formal and indefinite hold on adjudication of applications. The case here is distinguishable from *Khachutorov* and other cases involving routine processing delays. Defendant admits USCIS will refuse to adjudicate Plaintiffs' applications while the Policy Memoranda are in place. *See* Dkt. 22 at 2.

Finally, Defendant makes a jurisdictional argument regarding Plaintiff's APA and mandamus claims, relying on 5 U.S.C. § 701(a)(1)-(2). Dkt. 22 at 10. Section 701(a) provides that "this chapter" (including section 706(1) "applies, according to the provisions thereof, except to the extent that--(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)-(2). Defendant does not elaborate on this jurisdictional argument or specify whether he is relying on 701(a)(1) or (a)(2), but neither bars jurisdiction over Plaintiff's APA or mandamus claims.

The Ninth Circuit recently held that "the APA's express limitation that it does not apply when 'statutes preclude judicial review,' 5 U.S.C. § 701(a)(1), applies whenever the agency action at issue falls within the INA's jurisdictional bar in § 1252(a)(2)(B)(ii)." *Chairez v. Mayorkas*, 168 F.4th 1227, 1231 (9th Cir. 2026). As discussed in section III.A.2. above, 8 U.S.C. § 1252(a)(2)(B)(ii) does not preclude judicial review in this case, and thus 5 U.S.C. § 701(a)(1) does not apply.

Turning to 5 U.S.C. § 701(a)(2), the Ninth Circuit explained in *Chairez* that "[c]onfusing as it might be, the question whether 'agency action is committed to agency discretion by law'—

---

of the decision" on his or her application for adjustment of status "and, if the application is denied, the reasons for the denial." 8 C.F.R. § 245.2(a)(5)(i). Courts have concluded that this regulation establishes a "mandatory duty to act" on Form I-485 applications for adjustment of status. *See Singh v. Still*, 470 F. Supp. 2d 1064, 1067 (N.D. Cal. 2007); *Wang,* 550 F. Supp. 2d at 1258.

United States District Court
Northern District of California

and thus is carved out of the APA by 5 U.S.C. § 701(a)(2)—differs substantially from the question whether a particular agency action is 'specified to be in the discretion' of the agency for purposes of § 1252(a)(2)(B)(ii)," with the exception in § 701(a)(2) being read "quite narrowly" and section 1252(a)(2)(B)(ii) being read "expansively." *Chairez*, 168 F.4th at 1231 (citations omitted). Defendant offers no justification for defeating the APA's "basic presumption of judicial review" (*id.*) in this case.

The relevant legal authorities as well as Defendant's admission at the preliminary injunction hearing that USCIS has a duty to process applications for employment authorization within a reasonable time demonstrate Plaintiffs' likely success in establishing that Defendant has a mandatory duty to act on their Form I-765 applications for employment authorization.

### ii.    Unreasonable delay

Plaintiffs argue that they are entitled to relief under 5 U.S.C. § 706(1) because Defendant has unreasonably delayed a decision on their I-765 applications and because Defendant's implementation of the Policy Memoranda amounts to an unlawful withholding of adjudication of those applications. Dkt. 6-1 at 9-17; *see also* Dkt. 1 ¶¶ 117-119.

"The distinction between agency withholding and delay is important." *See Al Otro Lado v. Exec. Off. for Immig. Rev.*, 138 F.4th 1102, 1120-21 (9th Cir. 2025), *cert. granted sub nom. Noem v. Al Otro Lado*, No. 25-5, -- S. Ct. -- , 2025 WL 3198572 (Mem) (Nov. 17, 2025).[5] As the Ninth Circuit explained in *Al Otro Lado*, claims under 5 U.S.C. § 706(1) for unreasonable delay are analyzed under a different framework than claims for unlawful withholding. "If an agency withholds a required action, it violates § 706(1) regardless of its reason for doing so" but "if an agency delays a required action, it violates § 706(1) only if the delay is unreasonable," which is a "fact-intensive inquiry analyzed under 'the so-called *TRAC* factors'" set forth in *Telecomms. Rsrch. & Action Ctr. v. FCC,* 750 F.2d 70, 79-80 (D.C. Cir. 1984). *Id*. at 1121 (internal quotation

---

[5] The issue presented in the Petition for Certiorari in *Al Otro Lado* did not concern the unreasonable delay/withholding issue but was instead "[w]hether an alien who is stopped on the Mexican side of the U.S.–Mexico border 'arrives in the United States' within the meaning of the Immigration and Nationality Act, 8 U.S.C. 1101 et seq., which provides that an alien who 'arrives in the United States' may apply for asylum and must be inspected by an immigration officer."

marks and citations omitted).

Turning first to Plaintiffs' claims that Defendant has unreasonably delayed a decision on their I-765 applications, the Court must evaluate the *TRAC* factors:  (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health or welfare is at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.  *See Independence Mining Co.*, 105 F.3d at 507 n.7 (citing *TRAC,* 750 F.2d at 80).

On the first *TRAC* factor, Defendant states that "USCIS generally adjudicates I-765 applications in the order they are received."  *See* Dkt. 22 at 15.  A first-in, first-out (FIFO) procedure for processing applications can constitute a rule of reason.  *See, e.g., Ray v. Cuccinelli*, No. 20-cv-06279-JSC, 2020 WL 6462398, at *9 (N.D. Cal. Nov. 3, 2020).  Here, however, even if USCIS at some point processed Form I-765 applications on a FIFO basis, the agency's implementation of the Policy Memoranda changed the process by placing a hold on the final adjudication of applications submitted by applicants from certain countries.  *See* Dkt. 1-1, 1-2; *see also* Dkt. 22 at 3 (stating that PM-602-0194 "clarified that the adjudication hold 'allows a case to proceed through processing, up to a final adjudication'").  Defendant's brief refers to a "line" of applicants (*see* Dkt. 22 at 2, 17, 23), but he has presented no evidence of how the supposed "line" operates now that many applications are on hold under the Policy Memoranda.  It appears that if and when Plaintiffs receive final adjudication of their applications, it will be *after* some later-filed applications submitted by applicants from countries that are not subject to the hold.  Thus, whatever FIFO process may have once existed is no longer in place.  This factor favors Plaintiffs.

The second *TRAC* factor considers whether Congress provided in the enabling statute a timetable or other indication of the speed with which it expects the agency to proceed.  On this

24

United States District Court
Northern District of California

factor, Plaintiffs point to 8 U.S.C. § 1571(b), which provides that "[i]t is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application . . . "  Dkt. 6-1 at 12-13.  Section 1571 does not establish a "mandatory timeline" regarding the adjudication of the immigration benefit applications at issue here, but "Congress [set] a normative expectation in [the statute] of a reasonable processing time for an immigrant benefit application as no more than 180 days after initial application." *Konchitsky v. Chertoff*, No. C07-00294 RMW, 2007 WL 2070325, at *4 (N.D. Cal. July 13, 2007); *see also Ray*, 2020 WL 6462398, at *8.

Eight of the Plaintiffs paid an additional $1,645.00 for "premium processing" of their I-765 applications.  Dkt. 1 ¶ 64; Dkt. 28-1.  According to the USCIS website, if an applicant pays the premium processing fee, "we guarantee that we will take adjudicative action on the case" within 30 business days for Form I-765 applications.  *See*  https://www.uscis.gov/forms/all-forms/how-do-i-request-premium-processing (last visited March 30, 2026).  None of the eight Plaintiffs who paid for premium processing received either adjudication within 30 days or a refund.  Dkt. 1 ¶ 64. Given the option for USCIS to refund the premium processing fee, arguably the program is not a guarantee that an applicant who pays the fee will receive adjudication of their I-765 application. Nevertheless, this program also provides a "normative expectation" as to the realistic and feasible processing times for certain I-765 applications.

Defendant cites information from the USCIS website for the proposition that "average processing time for employment-based adjustment applications in the field office is currently 11 months."  Dkt. 22 at 15.  In *Varniab*, another case decided by this Court and cited by Defendants (*id.*), Defendants offered the same 11-month data but the Plaintiffs presented evidence, which this Court found "persuasive[]," that approximately 80 percent of cases involving Form I-765 based on a pending Form I-485, were completed within four months.  *Varniab*, 2026 WL 485490, at *13. In any event, the data offered by Defendant is of limited relevance to this case, which focuses on I-765 applications that Plaintiffs have submitted in a variety of situations, not simply "employment-based adjustment applications."  Moreover, whether a normative or average processing time is usually 180 days or some other period also is of limited relevance to the *TRAC* analysis given that under the Policy Memoranda, final adjudication of Plaintiffs' benefit applications is on indefinite

25

hold.  This factor favors Plaintiffs.

The third and fifth *TRAC* factors overlap and are often addressed together. *See Independence Mining*, 105 F.3d at 509.  Courts have held that delay in processing immigration status applications affects interests involving health and welfare.  *See Singh*, 470 F. Supp. 2d at 1069.  As discussed in more detail in section III.B.2. below concerning irreparable harm to Plaintiffs, they suffer substantial prejudice from the delay in processing their applications that extends beyond mere economic harm from loss of employment; the delay imperils their very ability to be employed in the United States and to pursue their chosen professions in ways that do not apply to all applicants.  Understandably, the uncertainty regarding Plaintiffs' ability to work in light of fast-approaching deadlines by which they must take steps to continue or advance in their professions has also caused Plaintiffs emotional strain and impaired their ability to make life decisions.  Some courts in this District have required plaintiffs asserting delayed adjudication to show more than "general harms experienced by all [] applicants." *Kullab v. U.S. Dep't of Homeland Security*, No. 24-cv-04140-WHO, 2025 WL 901943, at *7 (N.D. Cal. Mar. 25, 2025). Even if such a showing is required, Plaintiffs here satisfy the requirement.  Moreover, a delay in the decisions regarding Plaintiffs' employability not only impacts their personal health and welfare but also impacts this country's health and welfare more broadly given Plaintiffs' scientific and medical education, training, and work experience.  These factors favor Plaintiffs.

On the fourth *TRAC* factor, which concerns the effect of expediting delayed action on Plaintiffs' applications on agency considerations of a higher or competing priority, Defendant argues that "[b]y demanding immediate adjudication, Plaintiffs effectively ask this Court to leapfrog them ahead of other applicants—including those applicants from the same countries who have been waiting longer than Plaintiffs." Dkt. 22 at 17.  Defendant also suggests that granting Plaintiffs' requested relief will "foster[s] a pernicious incentive structure for filing unreasonable-delay suits." *Id.*  But as discussed above, Defendant claims that prior to USCIS's adoption of the Policy Memoranda, immigration benefit applications were processed on a FIFO basis.  Once USCIS issued PM-0192 on December 2, 2025, Plaintiffs were taken out of line at the final adjudication step.  In the meantime, applicants from countries not subject to the Policy

United States District Court
Northern District of California

Memoranda are the ones who have been allowed to "leapfrog" in front of Plaintiffs as those third parties' applications continue to be processed through final adjudication.  Although both Policy Memoranda refer to issuance of a prioritized list within 90 days of issuance (Dkt. 1-1 at 3; Dkt. 1-2 at 5), one would expect (given the national security concerns invoked in the Policy Memoranda) that review of applicants who present specific national security concerns would take the highest priority.  If, in fact, Plaintiffs do not present such national security concerns, they will fall behind yet another group of applicants in processing.  Thus, Defendant's implementation of the adjudicatory hold under the Policy Memoranda has disrupted any "line" that existed, and Defendant has failed to offer any suggestion for a fairer way to place Plaintiffs back in the line for processing.  Under these circumstances, Defendant has failed to demonstrate that expediting delayed action on Plaintiffs' applications will undermine agency considerations in maintaining a cognizable "line" of applicants.

Defendant's opposition brief and the Policy Memoranda themselves reference national security considerations.  *See, e.g.,* Dkt. 22 at 9; Dkt. 1-1; Dkt. 1-2.  Although national security is an important priority, "the mere invocation of national security is not enough to render agency delay reasonable per se." *Singh*, 470 F. Supp. 2d at 1069.  In *Singh*, the Government had identified national security concerns specific to that plaintiff, but the court nevertheless held that "the effect of expediting this matter upon the agency's 'activities of a higher [or] competing priority' appear to be limited." *Id.* at 1070.  Defendants' invocation of national security concerns is even less salient in the context of Plaintiffs in this case, who have been living and working in the United States for an extended period and about whom Defendants have identified no specific national security concerns.  As the court explained in *Wang*, in which the plaintiff (Wang) in an unreasonable delay case had been living and working in the United States for years: "If Wang presents a threat to national security and public safety, the Government does not ameliorate that threat by delaying a decision" on application for immigration benefits.  550 F. Supp. 2d at 1260.  The same is true here, where Defendants have not identified any national security justification for further delaying action on Plaintiffs' applications.  This factor favors Plaintiffs.

On the sixth *TRAC* factor, Plaintiffs claim the policy announced in the Policy Memoranda

"is an unlawful attempt of inducing financial hardship to remove plaintiffs of particular nationalities from the United States," citing a social media post by the Department of Homeland Security.  Dkt. 6-1 at 16.  Defendant does not address this point except to argue that Plaintiffs have not established "any impropriety by the agency in connection with their I-765's."  Dkt. 22 at 17.  As Plaintiffs note, the Court need not find that the agency acted improperly in order to find that agency action has been unreasonably delayed.  *See* Dkt. 6-1 at 16 (citing *TRAC*, 750 F.2d at 70).  Based on the evidence presently before the Court, the sixth *TRAC* factor is neutral.

Overall, the *TRAC* factors weigh in favor of the contention that Defendant's delay in processing their applications for immigration benefits is unreasonable.  Defendant points out that Plaintiffs' applications have not been pending as long as other cases in which courts have found unreasonable delay.  *See* Dkt. 22 at 13-14.  However, most of the cases cited by Defendant involved routine processing delays, not an agency policy that places applications on a formal adjudication hold.  *See Khachutorov,* 792 F. Supp. 3d 1106 (discussed above); *Shihuan Cheng v. Baran,* No. CV 17-2001-RSWL-KSX, 2017 WL 3326451 (C.D. Cal. Aug. 3, 2017).  In the one case cited by Defendant on this quantitative point that involved a hold on an application (while waiting to see if USCIS extended its exemption authority to cover the plaintiff), the court found on summary judgment that a five-year delay was unreasonable not because it exceeded a particular quantitative threshold but because the Government had provided "no evidence regarding the likelihood of an exemption in the future or how rendering a decision would affect or challenge USCIS policies."  *Querishi v. Napolitano*, No. C-11-cv-05814-YGR, 2012 WL 2503828, at *7 (N.D. Cal. June 28, 2022).  "Defendants cannot hold the Application indefinitely" and "[e]ven if Plaintiff could receive an exemption in the future, it is also possible he will never receive one."  *Id.*  As Defendant describes *Querishi*, the court held that the delay "due to USCIS policy hold was unreasonable where [there was] no indication of when the plaintiff could anticipate adjudication of [his] petition."  Dkt. 22 at 13.  Plaintiffs in this case are in the same situation.

Moreover, decisions condoning years-long delays "cannot be squared" with the principles that "(i) immigration-benefit applications should generally be processed not later than 180 days after the initial filing of the application, 8 U.S.C. § 1571(b); (ii) a reasonable time for agency

28

action is typically counted in weeks or months, not years; and (iii) determining whether a delay is unreasonable is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Raju v. Cuccinelli*, No. 20-cv-01386-AGT, 2020 WL 4915773, at *2 (N.D. Cal. Aug. 14, 2020) (internal quotation marks and citations omitted).

The particular facts and circumstances of this case are that although the past delay in processing Plaintiffs' applications currently ranges from approximately 4 to 16 months, final adjudication is now on formal hold under the Policy Memoranda and there is no discernable end point to the ongoing delay. PM-0192 refers to a prioritized list to be completed by USCIS within 90 days of the issuance of the Policy Memorandum and states that USCIS will "issue operational guidance" within the same period. Dkt. 1-1 at 3. PM-1094 contains similar 90-day provisions. Dkt. 1-2 at 5. Neither Policy Memorandum explains what will happen with this "prioritized list" the nature of any forthcoming "operational guidance."

At the time of the February 10, 2026, preliminary injunction hearing in *Varniab*, Defendants were unable to explain to this Court how these events will impact the adjudication hold. When the Court asked the Government to explain what the "prioritized list for review" is, defense counsel stated: "I don't know about that, your Honor. I'm not sure what that would be. We would have to – my understanding is that we would wait until March to understand that further." *Varniab,* N.D. Cal. Case No. 25-cv-10602-SVK, Dkt. 34 (2/10/26 Hrg. Tr.) at 10:2-5; *see also id.* at 10:6-9 (response by defense counsel to question about whether she had any information about how the prioritized list would be used or how it would impact the process: "I don't, your Honor"). Similarly, Government counsel referred to an expectation of "guidance" within 90 days of issuance of PM-0192 but could not identify what type of guidance is expected or from whom. *Id.* at 8:21-25 ("So applications that are subject to this hold would still go through all of those processes, until they are ready for the final decision, and then that's where they would be held, and then we're looking for further guidance as to kind of what to do at that point"). Moreover, PM-0192 links the adjudication hold to the planned "comprehensive review of all policies, procedures, and guidance," which could be a lengthy process. Dkt. 1-1 at 2.

The hearing on the motion for preliminary injunction in this case took place on March 3,

29

2026, which was more than 90 days after issuance of PM-0192.  In other words, the time within which USCIS said it would issue a "prioritized list" and "operational guidance" had passed.  At the hearing, counsel for Defendant said he had no updates on these matters or any information on when they would be forthcoming.  Dkt. 39 (3/3/26 Hrg. Tr.) at 2:16-3:7.  And since the hearing, the second 90-day period (under PM-0194) has passed.  Defendant has not informed this Court of any updates since the hearing.

Even after the recent developments discussed in section I.A. above, including statements in the USCIS 3/30 Alert that the adjudicative hold has been lifted as to some applications for employment authorization, Defendant confirms that Plaintiffs' applications remain on hold.  *See* Dkt. 35.

The Court finds that absent any strict statutory timeframe, and in the absence of any reasonable alternative proposal by Defendant (who concedes an obligation to act on Plaintiffs' applications within a reasonable time), the 180-day "normative expectation" under 8 U.S.C. § 1571(b)provides the best guidance for determining when delay in processing an I-765 application becomes unreasonable.  Thus, at the point a Plaintiff's I-765 application has been pending for more than 180 days, that Plaintiff is likely to prevail on his or her unreasonable delay claim.

### iii.    Unlawful withholding

Even if Defendant's reasons for delaying adjudication of Plaintiffs' immigration benefit applications were reasonable, "[i]f an agency withholds a required action, it violates § 706(1) regardless of its reason for doing so."  *Al Otro Lado*, 138 F.4th at 1121.  In *Al Otro Lado*, the Ninth Circuit concluded that the absence of a statutory deadline for agency action does not preclude a finding that the agency has withheld the required action.  *Id.*  The Ninth Circuit held that "when an agency refuses to accept, in any form, a request that it take a required action, it has 'withheld' that duty within the meaning of § 706(1)."  *Id.* at 1122.  The court explained:

> Our interpretation of the difference between withholding and delay in § 706(1) comports with the ordinary meaning of those terms.  When an action is delayed, one expects that, with the passage of time (maybe even an unreasonable amount of time), the action eventually will be completed.  By contrast, when an action has

30

been withheld, no amount of waiting can be expected to change the situation. With patience, one can wait out delay, but even with superhuman patience, one cannot wait out withholding.

*Id.* at 1122.

To be sure, in this case Defendant did not refuse outright to accept Plaintiffs' Form I-765 applications. However, Defendant admits that under the Policy Memoranda, final adjudication of the applications is on hold. Defendant has failed to explain when and by what criteria a decision will be made to lift the hold. Moreover, even though the USCIS 3/30 Alert states that the agency has "established an internal process for lifting holds on individual or group cases" and has lifted the holds pertaining to certain applications, whatever changes the agency has made have not changed the fact that all of Plaintiffs' applications remain on hold. Dkt. 35. Defendant offers no information as to whether or when that situation will change. *See id.*

Because the Court has already concluded that Plaintiffs are likely to succeed on Claim 2 under 5 U.S.C. § 706(1) on a theory of unreasonable delay, it does not further analyze their claim for unlawful withholding under that section.

### b. Claim 3 (APA arbitrary and capricious) and Claim 4 (APA rulemaking process)

The APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. Under 5 U.S.C. § 706(2), a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; [or] (D) without observance of procedure required by law[.]" Plaintiffs' third and fourth causes of action allege that USCIS's promulgation and implementation under the Policy Memoranda of a hold on the adjudication of all pending benefit requests for aliens from certain countries was arbitrary and capricious and failed to comply with notice-and-comment procedures. Dkt. 1 ¶¶ 122-134; *see also* Dkt. 6-1 at 17-19. All Plaintiffs are likely to succeed on both causes of action.

### i. Final agency action

Plaintiffs do not claim that the Policy Memoranda are reviewable by statute, so the

United States District Court
Northern District of California

threshold question on whether the Court may review those Policy Memoranda is whether they constitute "final agency action." *See Amer. Federation of State County and Municipal Employees, AFL-CIO v. United States Office of Management and Budget*, 807 F. Supp. 3d 1004, 1032 (N.D. Cal. 2025); *also* 5 U.S.C. § 704. Both sides agree that under the operative legal test, an agency action is final only if it is: (1) the consummation of an agency's decision-making process, and (2) an action by which rights or obligations have been determined or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see also* Dkt. 22 at 10; Dkt. 24 at 7. The Supreme Court has long taken a "pragmatic" approach to determining whether an agency action is final. *San Francisco Housing Ass'n v. Dep't of the Interior,* 946 F.3d 564, 578 (9th Cir. 2019) (quoting *U.S. Army Corps. of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

Defendant argues that the Policy Memoranda are not "final agency actions." Dkt. 22 at 11-12. On the first prong under *Bennett*, Defendant argues that the Policy Memoranda are not the consummation of a decision-making process but instead "merely advise 'the public of the agency's construction of rules which it administers.'" Dkt. 22 at 10 (quoting *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015)). This argument is difficult to reconcile with the structure and the language of the Policy Memoranda. The Policy Memoranda do not purport to interpret existing rules but instead create new rules and procedures. Specifically, PM-0192 imposes new procedures applicable to benefit applications from aliens from the specified countries including "a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." Dkt. 1-1 at 1*; see also id.* at 3 (identifying four issues to be reviewed "on a case-by-case basis to assess benefit eligibility"). PM-0192 also announces a new effort by USCIS to "conduct a comprehensive review of all relevant policies, procedures, and operational guidance for compliance, accuracy, and needed improvements during this time. *Id.* at 1-2. Most importantly for the purposes of the present motion for preliminary injunction, PM-0192 unambiguously places an indefinite hold on final adjudication of all pending benefit applications for aliens from a list of countries including Iran and Sudan. *Id.* at 1. PM-0194 confirms the existence of the hold. Dkt. 1-2 at 1 n.2.

According to Defendant, "the Policy Memorandums specifically state that they are temporary guidance, and more will be forthcoming [and] [t]he Memorandums 'mark a midstream pause in an ongoing administrative process—one that remains open to further agency consideration.'" Dkt. 22 at 10 (quoting *Kewayfati v. Bondi*, 165 F.4th 342, 346 (5th Cir. 2026)). Defendant notes provisions in both memoranda that anticipate the issuance of operative guidance within 90 days. Dkt. 22 at 3; *see also* Dkt. 1-1 at 2-3; Dkt. 1-2 at 5. However, "a number of cases support the proposition that significant pauses and blanket moratoria are final agency actions that cannot be exempted from judicial review merely by being characterized as intermediate." *Massachusetts v. Trump*, 790 F. Supp. 3d 8, 26 (D. Mass. 2025) (citing cases). For example, in the immigration context, a memorandum issued by the Department of Homeland Security that called for a department-wide review of policies and practices concerning immigration enforcement and ordered an immediate 100-day pause on the removal of any noncitizen with a final order of removal was held to meet the *Bennett* criteria for final agency action, notwithstanding that the Secretary retained the discretion to change or abandon the nonenforcement policy at any time. *Texas v. United States*, 524 F. Supp. 3d 598, 642 (S.D. Tex. 2021). As the court in *Bowser* explained in connection with its holding that the same Policy Memoranda at issue in this case constitute final agency action, "[j]ust because the policy is subject to change does not mean it is interim" and "[i]n fact, all laws are subject to change" including the Constitution of the United States. *Bowser*, 2026 WL 555624, at *5 (internal quotation marks and citations omitted).

As a result, this Court agrees with the court in *Bowser* that "[a]s this appears to be an indefinite moratorium on applications for immigration benefits from [] 39 countries," the first prong of *Bennett* is satisfied." *Bowser*, 2026 WL 555624, at *6. This conclusion is not changed by more recent developments because as discussed in section III.B.1 above, the adjudicative hold on Plaintiffs' applications remains indefinite.

Defendant argues that the Policy Memoranda fail to satisfy the second prong of the *Bennett* test for determining whether an agency action is final because "the Policy Memorandums do not determine any noncitizens' rights or obligations, nor 'upend' the normal vetting process, but allow an application to continue to move forward until it is ready for a decision, with only the decision

being deferred while the agency develops enhanced security protocols. Dkt. 22 at 11 (citing Dkt. 1-2 at 1 n.2). However, as admitted in Defendant's opposition brief and as explained in PM-0194, the adjudicatory hold put in place by the Policy Memoranda prevents final adjudication of Plaintiffs' applications, *i.e.,* a final decision on whether to approve, deny, or dismiss their applications. *See* Dkt. 22 at 11; Dkt. 1-2 at 1 n.2.

As a result, the Policy Memoranda affect Plaintiffs' rights. As discussed in more detail in section III.B.2. below, without final adjudication of their Form I-765 applications, Plaintiffs cannot work in the United States. "Courts have regularly determined that [the second prong of the finality test] is satisfied when an indefinite pause is imposed by an agency." *New York v. Trump*, 811 F. Supp. 3d 215, 234 (D. Mass. 2025) (citing cases and holding that 60-day pause in issuance of wind energy authorizations pending assessment of federal wind leasing and permitting practices was a final agency action); *see also Doe v. Trump*, 288 F. Supp. 3d 1045, 1070 (W.D. Wash. 2017) (holding that memorandum issued by agencies including DHS that suspended for at least 90–days the entry of refugees who are nationals of or residents of certain countries was a final agency action because "whether the Agency Memo produces a 'suspension' or an indefinite delay, [it] has significant real-world impacts on Plaintiffs' various situations."). "[E]ven short delays can have cascading effects" on applicants. *Doe v. Trump*, 288 F. Supp. 3d at 1070. Here, similarly, it does Plaintiffs little practical good if some processing of their applications continues if USCIS places an indefinite hold on any decision on the applications. At stake is "not simply the loss of employment" but the fact that the hold "prevents [Plaintiffs] from continuing [their] employment or from pursuing any other employment." *Bowser*, 2026 WL 555624, at *6. Here, "[the agency's] position was definitive and the legal consequences for [Plaintiffs] were real," which are "the hallmarks of APA finality." *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 581 (2019) (citations omitted).

Plaintiffs are likely to succeed in showing that the Policy Memoranda are final agency actions for purposes of their third and fourth causes of action for violation of the APA. *See Bowser*, 2026 WL 555624, at *6. The Court next considers the elements of both of these causes of action in assessing Plaintiffs' likelihood of success.

United States District Court
Northern District of California

**ii.    Arbitrary and capricious**

Plaintiffs' third cause of action alleges that Defendant's decision to withhold adjudications pursuant to the Policy Memoranda was arbitrary and capricious. Dkt. 1 ¶¶ 122-125. Plaintiffs argue that they are likely to succeed on this point because "Defendants did not acknowledge, let alone meaningfully consider, the reliance interests of [immigration benefits] applicants harmed by their actions." Dkt. 6-1 at 17. The Court agrees.

As noted above, the APA authorizes courts to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The touchstone of arbitrary and capricious review under the APA is reasoned decisionmaking." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (internal quotation marks and citations omitted). "That means an agency's action can only survive arbitrary or capricious review where it has articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks and citations omitted). "[I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the agency's decisionmaking is insufficiently reasoned. *Id.* at 492 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Important aspects that the agency must consider include "the costs as well as the benefits" of the agency action. *State Farm*, 463 U.S. at 54.

The background section of PM-0192 states that "[r]ecently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people," citing two incidents of violence in 2024 and 2025 that involved Afghan nationals. Dkt. 1-1 at 2. PM-0192 explains that "[i]n light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 [and possibly outside this timeframe] is necessary." *Id.* The Policy

United States District Court
Northern District of California

Memorandum further explains that "[t]o assess vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudication hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk countries outlined in PP 10949." *Id.* PM-0192 states that the hold will remain in effect "until lifted by the USCIS Director through a subsequent memorandum." *Id.* at 2-3. PM-0194 contains similar language. *See* Dkt. 1-2 at 1, 1 n.2, 3. Plaintiffs' arbitrary and capricious claim focuses on the hold component of the Policy Memoranda rather than other portions of the Policy Memoranda that anticipate implementation of new re-review processes and a comprehensive review of all policies, procedures, and guidance. *See* Dkt. 1 ¶¶ 122-125; Dkt. 1-1 at 2; Dkt. 1-2 at 1, 3.

It is undisputed that by placing a hold on final adjudication of immigration benefit applications from applicants from the countries that are subject to the Policy Memoranda, the USCIS departed from its existing policies. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). At a minimum, an agency that "changes its existing position" must "display awareness that it is changing position and show that there are good reasons for the new policy.'" *Id.* (internal quotation marks and citation omitted). An agency undertaking "policy change" must also provide "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Id.* at 222 (citation omitted). "[A]n unexplained inconsistency in agency policy is a reason for holding [a new action] to be an arbitrary and capricious change from agency practice." *Id.* (internal quotation marks and citation omitted); *see also Pacito v. Trump*, 169 F.4th 895, 937 (9th Cir. 2026) ("although the Government may be entitled to change its mind as to what agency priorities are, it must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored" (internal quotation marks and citation omitted)).

Defendant argues that "USCIS considered and addressed the interests of the I-765 applicants in deciding to implement the pause." Dkt. 22 at 18. In support of this argument,

36

Defendant cites language that appears in both Policy Memoranda stating that USCIS had "considered" that the pause could "result in delay" to some pending applicants, but nonetheless concluded that, when weighed against the "urgent need" to "ensure that applicants are vetted and screened to the maximum extent possible," any potential delay was "necessary and appropriate." *Id.* (quoting Dkt. 1-1 at 3; Dkt. 1-2 at 4). This language is merely conclusory and as such provides no explanation as to how USCIS "weighed" the competing factors and determined that the consequences of delays imposed by the hold were necessary. The agency must provide a "reasoned explanation" for disregarding "serious reliance interests" stemming from the prior policy. *Encino Motorcars*, 579 U.S. at 222. The agency must also show consideration of "alternatives … within the ambit of the existing policy." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted). Defendant has failed to show that these requirements are satisfied.

Moreover, Defendant's argument focuses only on the delay consequence of the adjudicatory hold. Defendant cites no evidence that the agency actually considered other consequences of the indefinite hold on final adjudication of pending I-765 applications. For example, and as also discussed in section III.B.2. below, Plaintiffs have presented evidence that in reliance on the prior policy, they legally came to the United States, obtained employment or enrolled in academic programs, and engaged in other steps necessary to achieve their long-term professional goals. *See generally* Dkt. 6-2. The Policy Memoranda contain no indication that the agency considered the professional and other consequences and burdens imposed on applicants such as Plaintiffs, including the risk to their ability to work in the United States, possible loss of lawful status, and other harms flowing from the change in agency policy. Where, as here, the Government failed to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns," affected plaintiffs are likely to succeed on an APA challenge to an agency's decision to change its position on agency priorities. *Pacito*, 169 F.4th at 937 (quoting *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020)).

Notably, the hold component of the Policy Memoranda extends far beyond EO 14161,

Proclamation 10949, or Proclamation 10998, which the Policy Memoranda purported to implement. Those pronouncements focused on restricting the *entry* of aliens from certain countries deemed to be high-risk, reciting the President's authority under INA 212(f) to suspend or restrict the entry of aliens from those countries. Dkt. 23-1 at CAR000001-CAR000003; CAR000056-CAR000064; CAR000065-CAR0000067. But the adjudicatory hold extends far beyond that context because it applies to nearly all pending benefit requests from applicants such as Plaintiffs *who have already been admitted to and living the United States for an extended period*. *See* Dkt. 1-1 at 1; Dkt. 1-2 at 1. An Executive Order or Presidential Proclamation that calls for greater restrictions on the *entry* of aliens from certain countries cannot serve as a reasonable justification for an indefinite hold on adjudication of applications for immigration benefits by aliens who have already been lawfully admitted. *See Pacito*, 169 F.4th at 937 (affirming district court's conclusion that decision to terminate domestic resettlement services, ostensibly based on Executive Orders for a pause in foreign development assistance, was likely arbitrary and capricious).

Moreover, there is no evidence that Defendant considered reasonable alternatives to the expansive hold policy. *See AIDS Vaccine Advoc. Coalition v. United States Dep't of State*, 766 F. Supp. 3d 74, 82 (D.D.C. Feb. 13, 2025) ("Defendants have not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs.").

Defendant's argument, in effect, is that without a hold, USCIS might approve pending applications from individuals who later turn out to present national security concerns before it is able to implement enhanced vetting procedures. *See, e.g.,* Dkt. 22 at 9. But as Courts in the Ninth Circuit have recognized, in that scenario the Government is not left without a remedy. *See Singh*, 470 F. Supp. 2d at 1070 ("should facts become known to [the Government] that [the I-485 applicant] is in fact a national security threat" the government "always [has] the option of moving to rescind the grant of residency or initiate removal proceedings"); *Wang*, 550 F. Supp. 2d at 1260 ("If the Government granted [the alien's] application for adjustment of status, it would retain a

38

panoply of options in the event that it discovered that [he] posed a threat to national security," such as arrest or deportation"). As noted in *Wang*, if the Government is concerned about public safety and national security, particularly with respect to applicants already in the United States, it should find a way to process adjustment of status applications more quickly "thereby revealing threats to security more quickly." *Wang,* 550 F. Supp. 2d at 1260. Defendant has offered no evidence that the agency considered such alternatives to the adjudicatory hold policy.

Defendant also argues that "Plaintiffs' alleged reliance interests as I-765 applicants are not based on any cognizable expectation that their I-765's would be adjudicated without additional screening." Dkt. 22 at 19. This mischaracterizes Plaintiffs' reliance argument. Their expectation was not that their applications "would be adjudicated without additional screening" but was instead that their applications in fact would be adjudicated, not put on indefinite hold. As *Bowser* recognized in holding that the plaintiffs in that case were "likely to succeed on their claim that the adjudicatory hold aspects" of the same Policy Memoranda were arbitrary and capricious under the APA, "[t]here are a great deal of reliance interests at issue here." 2026 WL 555624, at *8.

Likewise, Plaintiffs in this case are likely to succeed on their claim that the adjudicatory hold components of the Policy Memoranda are arbitrary and capricious and must therefore be set aside under the APA.

### iii.     Observance of procedure required by law

Plaintiffs' fourth cause of action alleges that the Policy Memoranda were adopted without following required procedures. Dkt. 1 ¶¶ 126-134. "Under the APA, a federal administrative agency is required to follow prescribed notice-and-comment procedures before promulgating substantive rules." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009). The requisite procedures include publishing notice of proposed rules in the Federal Register and then allowing interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments. *See* 5 U.S.C. § 553. "These procedures are designed to assure due deliberation of agency regulations and foster the fairness and deliberation that should underlie a pronouncement of such force." *East Bay Sanctuary Covenant v. Trump,* 932 F.3d 742, 775 (9th Cir. 2018) (internal quotation marks and citations omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

Defendant concedes that notice-and-comment procedures were not followed before promulgating the Policy Memoranda.  *See* Dkt. 22 at 19.

Rules are "substantive," and therefore subject to the APA's notice-and-comment requirements, if they "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."  *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 449 (9th Cir. 1994).  In the area of immigration policy, "[c]ourts require agencies to engage in notice and comment rulemaking when implementing policy changes with substantive consequences for refugees and other immigrants." *Doe v. Trump*, 288 F. Supp. 3d at 1073 (on motion for preliminary injunction, finding that plaintiffs were likely to succeed on claim that agencies should have engaged in APA rulemaking before issuing a memorandum that (1) indefinitely suspended certain refugees from entering the United States, and (2) suspended for at least 90–days the entry of refugees who are nationals of, and stateless persons who last habitually resided in, 11 particular countries that had been identified as posing a higher risk to the United States).

Defendant invokes the exemption from notice-and-comment procedures that applies to policy statements.  Dkt. 22 at 19 (citing 5 U.S.C. § 553(b)(A)).  Specifically, Defendant argues that the Policy Memoranda are "quintessential policy statements" that announce how USCIS will process immigration benefit applications and that "do not alter the rights or obligation of any applicant because they do not have 'direct and appreciable legal consequences'."  Dkt. 22 at 19 However, for the reasons discussed in section III.B.1.b.i. above, the Policy Memoranda have direct and appreciable consequences for Plaintiffs because they have imposed an indefinite hold on adjudication of Plaintiffs' I-765 applications.

Defendant's argument that the Policy Memoranda "do not impose any new obligations, prohibitions, or regulations on USCIS/applicants, but rather provide guidance to inform USCIS what it should consider in the exercise of its statutorily-prescribed discretion" is also misplaced. Dkt. 22 at 19-20.  Under Ninth Circuit law, to fall within the "policy statements" exception to rulemaking procedures, a general statement of policy (1) must "operate only prospectively," and (2) "must not establish a binding norm or be finally determinative of the issues or rights ... but must instead leave [agency] officials free to consider the individual facts in the various cases that

arise." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1014 (9th Cir. 1987) (internal quotation marks and citations omitted); *see also Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1186 (9th Cir. 2019) ("The critical factor to determine whether a directive announcing a new policy constitutes a legislative rule or a general statement of policy is 'the extent to which the challenged directive leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the announced policy in an individual case.'") (alterations omitted) (quoting *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009)).

Here, the adjudicative hold announced in the Policy Memoranda was not purely prospective but was applied to applications pending at that time, including those filed by Plaintiffs.  Although the Policy Memoranda nod to some discretion to exempt particular applications from the hold under narrow circumstances and if stringent procedures are followed, any discretion that exists is a far cry from leaving the agency "free to exercise discretion to follow, or not to follow" the hold policy in an individual case.  *See Gill* 913 F.3d at 1186.

Accordingly, the Court concludes that Plaintiffs are likely to succeed on their third and fourth causes of action for violation of the APA.

The Court has already concluded that Plaintiffs are likely to succeed on their first through fourth causes of action.  Plaintiffs "do[] not need to show a likelihood of success on *every* claim in order to obtain a preliminary injunction." *Museum of Handcar Tech. LLC v. Transportation Agency for Monterey Cnty.*, 778 F. Supp. 3d 1065, 1079 (N.D. Cal. 2025) (emphasis in original), *vacated in part on other grounds*, No. 24-CV-08598-EKL, 2025 WL 1810265 (N.D. Cal. June 30, 2025).  Accordingly, the Court does not address Plaintiffs' likelihood of success on their remaining causes of action.

### 2.    Irreparable harm

Having concluded that Plaintiffs are likely to succeed on their claims, the Court must also consider whether they have shown that they are likely to suffer irreparable harm in the absence of a preliminary injunction. *Winter,* 555 U.S. at 20; *Cottrell*, 632 F.3d at 1135.

Each Plaintiff has presented evidence as to why he or she needs employment authorization. Dkt. 6-2.  Defendant—who possesses extensive information about Plaintiffs not only from the

materials Plaintiffs have filed in this case but also from various immigration benefit applications Plaintiffs have filed—does not dispute the factual underpinnings of Plaintiffs' irreparable harm argument:  that they cannot continue or obtain employment in this country without work authorization.  Moreover, Defendant acknowledges that Plaintiffs will not receive employment authorization while they are subject to the adjudicative hold under the Policy Memoranda. *See, e.g,* Dkt. 22 at 11; Dkt. 35.

Although economic harm is generally insufficient to establish irreparable injury, the harm "extends beyond ordinary economic injury" where the plaintiffs "would not only suffer lost wages [but] would lose the legal ability to work at all," which would "implicate Plaintiffs' fundamental ability to earn a livelihood, support their families, and remain self-sufficient." *Miot*, 2026 WL266413, at *36; *see also Bowser*, 2026 WL 555624, at *9; *Doe v. USCIS*,[6] N.D. Ill. Case No. 26 C 2389, Dkt. 31-1 at 8 (N.D. Ill. Mar. 26, 2026).  Moreover, in the Ninth Circuit, the "loss of opportunity to pursue [one's] chosen profession[ ] constitutes irreparable harm." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, 781 F. Supp. 3d 920, 940–41 (N.D. Cal. 2025), *appeal dismissed,* No. 25-1677, 2025 WL 2976744 (9th Cir. Sept. 29, 2025) (quoting *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  For example, in *Brewer*, the Ninth Circuit reversed the district court's denial of a preliminary injunction against the Arizona governor's executive order directing state agencies to prevent issuance of state identification including driver's licenses to DACA recipients, finding that the plaintiffs' ability to drive was "integral to their ability to work."  757 F.3d at 1068-69.  The Ninth Circuit held that the plaintiffs had "produced ample evidence that Defendants' policy causes them to suffer irreparable harm" by "limiting their professional opportunities." *Id.* at 1068; *see also Doe v. Samuel Merritt Univ.,* 921 F. Supp. 2d 958, 964 (N.D. Cal. 2013) (granting preliminary injunction against medical school policies that prevented disabled student from completing clinical rotations required to

---

[6] In *Doe v. USCIS*, a district court in the Northern District of Illinois concluded that that it had jurisdiction to consider the plaintiffs' challenge to the Policy Memoranda but came to a different conclusion as to its authority to review the timeline for processing adjustment of status applications. *See Doe* at 5 (citing *Garcia v. USCIS*, 760 F. Supp. 3d 671, 673 (N.D. Ill. 2024)). This Court disagrees on the latter point for the reasons discussed in this Order.

United States District Court
Northern District of California

United States District Court
Northern District of California

complete her degree, finding irreparable harm based on showing that policies were "precluding [the student] from advancing her professional career"); *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011) (affirming district court's grant of preliminary injunction requiring defendant to accommodate plaintiff's disabilities in administering the California Bar Exam in case brought under Americans with Disabilities Act); *Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840 F.2d 701, 709-10 (9th Cir. 1988) (reversing denial of preliminary injunction because district court failed to consider irreparable harm if teacher was denied injunction reinstating him to classroom teaching position where alternative administrative position he was offered was distasteful to him, involved no student contact, and "does not utilize his skills, training or experience").

Under the circumstances of this case, including Plaintiffs' individualized showing of how their inability to obtain employment will negatively affect them professionally and personally, their inability to obtain work authorization while the adjudication hold remains in place constitutes imminent, irreparable harm.

Aside from the imminent and irreparable harm to Plaintiffs' ability to maintain or obtain employment, Plaintiffs have also presented evidence of other irreparable harm they will suffer if their applications remain frozen. Some Plaintiffs indicate they will potentially lose lawful status if they are unable to work. *See* Dkt. 6-2. Other harms include inability to make basic life decisions and significant emotional strain. *See id.*

Defendants' response to Plaintiffs' showing of irreparable harm is that "Plaintiffs have not established that the harm claimed would be prevented by a preliminary injunction" because "[e]ven if the Policy Memorandums evaporated today, there is no guarantee that Plaintiffs' I-765's would be granted in time to take advantage of the alleged employment opportunities, much less that they would be granted at all." Dkt. 22 at 23. This dismissive argument falls flat. Defendants do not make any showing that under the procedures in place before USCIS implemented the Policy Memoranda, any Plaintiff filed their I-765 applications too late to pursue the employment opportunities Plaintiffs have identified.

Therefore, Plaintiffs have each shown they will suffer imminent irreparable harm if

United States District Court
Northern District of California

Defendant continues to hold final adjudication of their Form I-765 applications for employment authorization.

### 3. Balance of equities and public interest

District courts must "give serious consideration to the balance of equities and the public interest"—the third and fourth *Winter* factors—in considering a motion for preliminary injunction. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (quoting *Winter,* 555 U.S. at 27). In weighing the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Weighing the public interest, on the other hand, "primarily addresses impact on non-parties rather than parties." *CTIA-The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 852 (9th Cir. 2019). The Parties agree that where, as here, the Government is a party to a case, the balance of the equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); see also Dkt. 6-1 at 25; Dkt. 22 at 23.

The relief Plaintiffs seek is to enjoin the hold on their I-765 applications and obtain a final adjudication of their applications within 30 days of the Court's order. They do not ask the Court to dictate a particular outcome on their applications, and the Court cannot and will not do so.

Defendant has not demonstrated that this relief will cause any significant hardship to the Government. According to the Government, USCIS has continued to process Plaintiffs' applications even after issuance of the Policy Memoranda, with a hold only on the final adjudication. *See* Dkt. 22 at 1 ("All of the Plaintiffs I-765's were filed between October 2024 and December 2025 and are all currently pending with, and still being processed by, U.S. Citizenship and Immigration Services ('USCIS') notwithstanding the December 2, 2025, Policy Memorandum I and January 1, 2026, Policy Memorandum II"); *see also* Dkt. 22-1, 22-2, 22-3 (declarations from USCIS personnel stating that "USCIS is continuing to process Plaintiffs' applications, following all statutes, regulations, policies, and procedures"). Even if additional steps are required to finally adjudicate the limited number of I-765 applications at issue in this case, there is no evidence that they will impose any significant burden on the Government. Moreover, PM-0194 identifies 10 categories of exceptions to the adjudication hold set forth in PM-0192, including an exception for "[b]enefit requests filed by aliens whose entry would serve a

44

United States national interest," such as certain scientists and medical researchers. PM-0194 at 5 and n.16.[7] The USCIS 3/31 Alert identifies (in general terms) additional categories where the adjudication hold has been lifted, including "certain employment authorization documents." This evidence indicates that there is a mechanism already in place to continue to adjudicate employment authorization applications notwithstanding the Policy Memoranda. Moreover, the fact that USCIS offers to process Form I-765 applications within 30 business days for those who pay a premium processing fee demonstrates the feasibility of an order requiring USCIS to complete the processing of Plaintiffs' applications, which have now been in processing for months, within 180 days of when they were filed.

To the extent Defendant's national security arguments bear on the balance of equities and the public interest, those arguments do not justify denial of a preliminary injunction. As already discussed, Defendant has not identified any information specific to Plaintiffs that suggest they pose a threat to national security, and in any event, withholding final adjudication of their Form I-765 applications while Plaintiffs are already in the country would not serve national security interests. Because preliminary injunctive relief would be limited to Plaintiffs only, it can cause no more than a slight burden on the policy purposes behind PM-0192, especially given that PM-0194 and the USCIS 3/30 Alert have already confirmed the existence of other exceptions to the adjudicatory hold.

Defendant has not demonstrated that granting a preliminary injunction to Plaintiffs would harm third parties. Defendant raises concerns of fairness if Plaintiffs are allowed to "jump the line" and obtain adjudication of their applications before others can have their applications processed, but as discussed in section III.B.1.a.ii. above those concerns are overblown.

Meanwhile, as discussed in section III.B.2. above, Plaintiffs have demonstrated that they will suffer concrete, imminent, and irreparable injury in the absence of an injunction. The balance of hardships tips sharply towards Plaintiffs.

Viewing the public interest from a broader perspective, the public interest at large would not be served by denial of a preliminary injunction, which would leave applicants like Plaintiffs,

United States District Court
Northern District of California

_____

[7] Whether any Plaintiff falls within any of these exceptions to the adjudication hold cannot be determined based on the present record.

45

who have advanced education and/or professional experience in a variety of scientific, technical, and business fields, in immigration limbo while final adjudication of their applications for employment authorization remains on indefinite hold.  This uncertainty would likely deter similarly-situated individuals from trying to work in those fields in the United States.

## IV.     CONCLUSION

For the reasons discussed above, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction and **ORDERS** as follows:

1.     Defendant and all of his respective officers, agents, servants, employees, attorneys, and any person in active concert or participation with them who receives actual notice of this Order are **ENJOINED** from applying the adjudication hold of the December 2, 2025 USCIS Policy Memorandum (PM-602-0192) and/or January 1, 2026 USCIS Policy Memorandum (PM-602-0194) to any Form I-765 (*Application for Employment Authorization*) application filed by any of the Plaintiffs.

2.     For the reasons explained in section III.B.1.a.ii. the Court concludes that the 180-day "normative expectation" set forth in 8 U.S.C. § 1571(b) provides the best guidance for crafting preliminary injunctive relief that will achieve the purpose of a preliminary injunction, which, as Defendant acknowledges, is to "preserve the status quo pending final judgment."  Dkt. 22 at 6 (citing *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)).  Accordingly, Defendant is **ORDERED** to adjudicate every pending Form I-765 (*Application for Employment Authorization*) application filed by any Plaintiff in this action within 180 days of the application filing date and inform the applicant of the decision and, if denied, the reasons for denial.

United States District Court
Northern District of California

3. The Court will allow Defendant 32 days, *i.e.,* until May 18, 2026, to come into compliance. As of the date of this Order, 14 of Plaintiffs' I-765 applications have been pending for 180 days or more, and an additional 9 of Plaintiffs' applications will reach that pendency by May 18, 2026. *See* Dkt. 28-1. Accordingly, the Court **FURTHER ORDERS** that for every Form I-765 (*Application for Employment Authorization*) application filed by any Plaintiff in this action that will have been pending 180 days or more as of May 18, 2026, *i.e.,* applications filed on or before November 19, 2025, Defendant shall adjudicate the application **by May 18, 2026** and shall inform the applicant of the decision and, if denied, the reasons for denial.

4. In calculating the pendency of each Plaintiff's I-765 application in connection with the foregoing provisions, the Parties are to use the "Date I-765 Filed" column in Plaintiffs' chart at Dkt. 28-1. Where the information in that column states that a Plaintiff's application is "Derivative," the date of that Plaintiff's I-765 filing will be treated as the date the primary applicant's I-765 application was filed.

5. **In ordering this preliminary injunctive relief, the Court cannot and does not order any particular outcome on Plaintiffs' I-765 applications.**

6. Counsel for Defendant must provide written notice of this Order to all officers, agents, servants, and employees of Defendant with responsibility for processing Form I-765 applications by **April 21, 2026 at 5:00 p.m. (Pacific Daylight Time).** Defendants must file a copy of the notice on the docket at the same time, and the notice filed with the Court must identify the first initial and last name, agency, and job title of all recipients of the notice. Defendant's notice may be filed under seal.

United States District Court
Northern District of California

7.     The Court finds that a bond is not required under Federal Rule of Civil Procedure 65(c) because Defendants did not request a bond or submit any evidence that they are likely to suffer damages from the injunction. *See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

8.     The Court will hold an in-person Case Management Conference on **June 9, 2026 at 10:00 a.m.**  The Parties' Joint Case Management Statement is due by **June 2, 2026** and must address the status of Defendants' compliance with this preliminary injunction, the status of the Policy Memoranda (including whether any modifications or additional guidance have been implemented), and the contents required under the Standing Order for All Judges of the Northern District of California regarding the contents of the Joint Case Management Statement.

**SO ORDERED.**

Dated: April 16, 2026

SUSAN VAN KEULEN
United States Magistrate Judge

48